# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of ) | Case No. 8:21-MJ-00801 |
| *(Briefly describe the property to be searched or identify the person by name and address)* ) | |
| Subject Devices ) | |
| ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute Controlled Substances |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Patrick D. McMahon, DEA Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: <u>Santa Ana, CA</u>          AUTUMN D. SPAETH, U.S. MAGISTRATE JUDGE
_____
*Printed name and title*

AUSA: Ann Luotto Wolf (213-393-8097)

**AFFIDAVIT**

I, Patrick D. McMahon, being duly sworn, declare and state as follows:

## I.  INTRODUCTION

1.    I am an investigative and law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), and I am empowered by law to conduct investigations of, and make arrests for, the offenses enumerated in Title 18, United States Code, Section 2516.  I am currently a Special Agent ("SA") with the Drug Enforcement Administration ("DEA"), Los Angeles Field Division, Orange County District Office ("OCDO"), and have been employed in this capacity since October 2020.

2.    During my employment, I have received comprehensive, formal instruction on such topics as drug identification, money laundering techniques, patterns of drug trafficking, complex conspiracies, exploitation of narcotics traffickers' telecommunications devices, criminal law, surveillance, and other investigative techniques.  I have assisted in investigations into the unlawful importation, manufacture, possession with intent to distribute, and distribution of narcotics (including cocaine, heroin, and methamphetamine), the laundering of narcotics proceeds, and conspiracies associated with narcotics offenses. In conducting these investigations, I have used a variety of investigative techniques and resources, including but not limited to techniques such as surveillance, confidential sources, pen registers, search warrants, and telephone toll analysis.

1

## II.   PURPOSE OF AFFIDAVIT

3.   This affidavit is made in support of an application for a warrant authorizing the search of three cellular telephones (collectively, the "**SUBJECT DEVICES**") seized by the Santa Ana Police Department ("SAPD") from Edward MURO ("MURO") following a traffic stop on November 4, 2021.  The **SUBJECT DEVICES** are currently maintained in the custody of the DEA:

    a.   one gray Verizon e Talk flip phone;

    b.   one black Samsung Galaxy S9 in a blue plastic case; and

    c.   one black Samsung Galaxy phone with an eye sticker on the back.

4.   The **SUBJECT DEVICES** are described above and in Attachment "A" to the search warrant application.  The requested warrant seeks authorization to search for and seize evidence, fruits, and instrumentalities of violations of federal law, as specified in Attachment "B," that is, violations of Title 21, United States Code, section 841(a)(1) (possession with intent to distribute controlled substances) (the "SUBJECT FEDERAL OFFENSE").

5.   This affidavit is submitted for the limited purpose of demonstrating that there is sufficient probable cause for the requested search warrant and does not purport to set forth all my knowledge of or investigation into this matter.  The facts set forth in this affidavit are based upon my personal observations, my training and experience, and/or oral and written reports about this investigation and physical surveillance conducted by federal

agents or local law enforcement agencies, which have been reported to me either directly or indirectly.  When I assert that a statement was made, I have either heard the statement directly in person or through review of an audio recording or the statement was reported to me by another law enforcement officer, either orally or in written form.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part, only.

### III.   STATEMENT OF PROBABLE CAUSE

6.   On October 19, 2021, SA Zachary Bargeron obtained an order authorizing the continued interception of wire and electronic communications; the installation and use of a pen register and a trap and trace device; and the release of subscriber information and cell site and GPS information for phone number 562-246-7919 ("TT3") (See Case No. 8:21-CM-00016(C)-JLS) used by Jose Zacarias FLORES DELEON ("FLORES DELEON"), a narcotics broker and methamphetamine, fentanyl, and cocaine distributor in the Southern California area.  Investigators from DEA OCDO began intercepting electronic information pursuant to this order on October 20, 2021 and continued through November 17, 2021.

**A.   November 4, 2021: FLORES DELEON Discusses Illegal Drug Transaction with CORTEZ-PEREGRINO and an Unknown Courier**

7.   On November 4, 2021, at approximately 4:47 p.m., David CORTEZ-PEREGRINO ("CORTEZ-PEREGRINO"), using phone number 714-702-2104 ("2104"), called FLORES DELEON on TT3 and said he would need up to "15."  FLORES DELEON replied that was fine, but to let him know as the "prices were going up a lot."  CORTEZ-PEREGRINO said he had worked with him before and some of his customers had

complained.  CORTEZ-PEREGRINO said "they" were not bad.  CORTEZ-
PEREGRINO stated the deal might go through if it was the same
"kind."  CORTEZ-PEREGRINO said he used to give to him before.
FLORES DELEON said these were the "ones" packaged before.
CORTEZ-PEREGRINO stated he did not want any powder.  FLORES
DELEON replied that was fine and asked CORTEZ-PEREGRINO to let
him know.  CORTEZ-PEREGRINO confirmed, alright.

     a.  Based on my training, experience, and knowledge of
the investigation, I know CORTEZ-PEREGRINO and FLORES DELEON
previously conducted illegal drug transactions together and were
discussing the details for a future transaction.  I believe
CORTEZ-PEREGRINO sells illegal drugs to several people and
receives the drugs from FLORES DELEON.

     8.  At approximately 5:41 p.m., CORTEZ-PEREGRINO, using
2104, called FLORES DELEON on TT3.  CORTEZ-PEREGRINO asked FLORES
DELEON if he was still working at the shop.  FLORES DELEON
replied, yes, he was still there.  CORTEZ-PEREGRINO said the guy
needed "10" for sure but just got the call that one of his
cousins was killed in Tijuana.  CORTEZ-PEREGRINO informed FLORES
DELEON about a guy going there for his cousin's cremation but
needed the "10" by tomorrow afternoon.  CORTEZ-PEREGRINO said he
wanted to make sure the "10" were available for sure.  CORTEZ-
PEREGRINO said he told the guy to check as it was not up to him.
FLORES DELEON responded he could wait.  CORTEZ-PEREGRINO stated
he would let the guy know.  FLORES DELEON replied, alright.

     a.  Based on my training, experience, and knowledge of
the investigation, I believe CORTEZ-PEREGRINO needed 10 units of

an illegal drug from FLORES DELEON to give to one of his customers.

9.    At approximately 6:09 p.m., CORTEZ-PEREGRINO, using 2104, called FLORES DELEON on TT3.  CORTEZ-PEREGRINO said today at 8:00 was fine.  FLORES DELEON acknowledged, alright.  CORTEZ-PEREGRINO said he needed "11."  FLORES DELEON replied, alright.  CORTEZ-PEREGRINO asked if FLORES DELEON remembered the place they would go in Santa Ana, it was by Warner.  FLORES DELEON acknowledged.  CORTEZ-PEREGRINO said he did not want to say the name and asked if FLORES DELEON remembered which place.  FLORES DELEON replied, he did not.  CORTEZ-PEREGRINO informed it was off Main and Warner, close to McDonald's; they drank there until morning.  FLORES DELEON asked if Santa Ana was safe.  CORTEZ-PEREGRINO responded, yes, his buddy wanted to see him there, and the owner of the restaurant was his friend, too.  FLORES DELEON asked which one.  CORTEZ-PEREGRINO responded but an audio glitch occurred.  FLORES DELEON said yes.  CORTEZ-PEREGRINO told FLORES DELON he had gone there after the parties, after 2:00.  FLORES DELEON confirmed, okay.  CORTEZ-PEREGRINO said to let him know once he was at the corner of Main and Warner at 8:00.  FLORES DELEON replied he would let CORTEZ-PEREGRINO know.

10.    At approximately 6:30 p.m., an unknown male using phone number 626-641-3561 ("UM3561") called FLORES DELEON on TT3.  UM3561 said he was calling on Cuando's behalf.  FLORES DELON asked if UM3561 was calling on behalf of Guayaba.  UM3561 reiterated, on behalf of Cuando.  FLORES DELEON asked if UM3561 had something for him.  UM3561 replied he was taking a "diente"

to FLORES DELEON.  FLORES DELEON stated that was fine and asked
if UM3561 had the address already.  UM3561 replied, yes and
should arrive in about an hour and half.  FLORES DELEON cursed.
UM3561 said he was in San Bernardino.  FLORES DELEON stated there
was not as much traffic anymore.  UM3561 responded he checked and
there was some traffic, and it was far.  FLORES DELEON asked if
UM3561 would arrive around 8:00.  UM3561 replied, around there.
FLORES DELEON responded that was fine.  UM3561 said he would let
FLORES DELEON know when he was close by.  FLORES DELEON
acknowledged, alright.

     a.  Based on my training, experience, and knowledge of
the investigation, I believe CORTEZ-PEREGRINO contacted FLORES
DELEON to determine a meet location where they met in the past.
I believe UM3561 contacted FLORES DELEON to learn where to meet
FLORES DELEON so he could deliver illegal drugs to him.  I
believe a "diente" is a term used to describe a quantity of
illegal drugs.

    11.  At approximately 6:32 p.m., FLORES DELEON, using TT3,
called CORTEZ-PEREGRINO on 2104.  FLORES DELEON told CORTEZ-
PEREGRINO they would arrive around 8:00.  CORTEZ-PEREGRINO
replied, it had to be at 8:00 over there.  FLORES DELEON stated
if CORTEZ-PEREGRINO wanted, he could have "them" taken over
there.  CORTEZ-PEREGRINO responded, the "appointment" was at
8:00.  FLORES DELEON said they would arrive at 8:00.  CORTEZ-
PEREGRINO replied, he was going to leave.  FLORES DELEON said
they could see him over there at 8:00.  CORTEZ-PEREGRINO
responded that was best as he was about to arrive to his house.

FLORES DELEON replied, okay, he would tell that guy to hurry and
to head over there instead.  CORTEZ-PEREGRINO instructed to make
sure it was no later than 8:00.  FLORES DELEON asked CORTEZ-
PEREGRINO to send an address.  CORTEZ-PEREGRINO replied, it was
at the corner he already told FLORES DELEON about.  FLORES DELEON
told CORTEZ-PEREGRINO to tell him again.  CORTEZ-PEREGRINO
responded, it was Warner and Main where FLORES DELEON had gone to
drink up to 2:00 in the morning.  FLORES DELEON replied, he did
not recall but would head over there and to also send the
location to him.  CORTEZ-PEREGRINO confirmed, he would send it.
FLORES DELEON acknowledged, alright.

    12.  At approximately 6:40 p.m., CORTEZ-PEREGRINO, using
2104, sent the following text message to FLORES DELEON on TT3:
"Las Gueritas Restaurant Bar (714)549-1822 https://maps.app.goo.
gl/pXvV1WBqijGRS6uJA."  FLORES DELEON responded, okay.

        a.  Based on my training, experience, and knowledge of
the investigation, I believe FLORES DELEON and CORTEZ-PEREGINO
were finalizing the details of where and when they would meet for
the delivery of illegal drugs to CORTEZ-PEREGRINO.

    13.  At approximately 6:43 p.m., FLORES DELEON used TT3 to
call UM3561.  FLORES DELEON said he had sent the location.
UM3561 replied, he heard it come through but had not seen it.
FLORES DELEON asked if he was heading over already.  UM3561
confirmed, yes.  FLORES DELEON told UM3561 to put it in and send
him a message.  UM3561 acknowledged, alright.

    14.  At approximately 6:47 p.m., UM3561 called FLORES DELEON
on TT3.  UM3561 asked if it was off Warner and Broadway.  FLORES

DELEON replied, it was Main.  UM3561 asked if it near Main and
Broadway, at the corner.  FLORES DELEON confirmed, yes.  UM3561
informed he be there in one hour.  FLORES DELEON replied that was
fine and told UM3561 to hurry.

15.  At approximately 6:50 p.m., FLORES DELEON, using TT3,
sent CORTEZ-PEREGRINO the following text message on phone 2104:
"Hey, there's 10."  CORTEZ-PEREGRINO replied, yes.  FLORES DELEON
confirmed, ok.

a.  Based on my training, experience, and knowledge of
the investigation, I believe FLORES DELEON was coordinating the
delivery of illegal drugs from UM3561 to him, which in turn would
be given to CORTEZ-PEREGRINO.

**B.   November 4, 2021: FLORES DELEON Receives Illegal Drugs from
Unknown Courier and Transfers Them to MURO**

16.  Based on the TT3 intercepts, on November 4, 2021, at
approximately 7:00 p.m., OCDO SAs and Task Force Officers
("TFOs") established surveillance in the vicinity of Restaurant
Las Gueritas in Santa Ana, CA.  At approximately 7:27 p.m.,
surveillance units watched FLORES DELEON, driving a gray Monte
Carlo, drive into the parking lot of Restaurant Las Gueritas and
park in the lot.  FLORES DELEON sat in the car for several
minutes, got out, and walked into the restaurant.  At
approximately 7:49 p.m., surveillance units saw FLORES DELEON
come out of the restaurant and get into his Monte Carlo.

17.  At approximately 7:50 p.m., FLORES DELEON, using TT3,
called CORTEZ-PEREGRINO on 2104.  FLORES DELEON asked CORTEZ-
PEREGRINO where he was.  CORTEZ-PEREGRINO replied, he was very

close.  FLORES DELEON acknowledged, alright.

18.  At approximately 7:57 p.m., UM3561 called FLORES DELEON on TT3.  UM3561 said he was in the area already.  FLORES DELEON asked if he was driving a truck.  UM3561 replied, it was a red truck, a Ram.  FLORES DELEON said he saw him pass by and told UM3561 to go back so they could park on the side.  UM3561 asked where and what car FLORES DELEON was driving.  FLORES DELEON replied, he was in a gray Monte Carlo.  UM3561 responded, he had seen FLORES DELEON and to go ahead, wherever FLORES DELEON wanted to go.  FLORES DELEON said, alright, he would park around there, and asked if UM3561 was right there.  UM3561 confirmed, yes. FLORES DELEON said, okay, he would park.

19.  At approximately 7:57 p.m., investigators saw the red Ram enter the parking lot of the restaurant and circle the lot. Investigators saw the driver and sole occupant of the Ram, who appeared to be a male Hispanic in his 30s.  Investigators watched the gray Monte Carlo drive out of the lot, followed by the Ram. The two vehicles pulled to the rear of the restaurant briefly. The Ram then left the location first, followed by FLORES DELEON in his Monte Carlo.  The vehicles went eastbound on Warner Avenue.

    a.  Based on my training, experience, and knowledge of the investigation, I know drug traffickers commonly park nearby when exiting a parking lot to see if they are being followed by law enforcement.

20.  At approximately 8:00 p.m., FLORES DELEON called UM3561 over TT3.  UM3561 told FLORES DELEON to go to the McDonald's

across from the CVS Pharmacy.  FLORES DELEON replied, okay.
Surveillance units saw FLORES DELEON and UM3561 park in the
McDonald's parking lot.  Surveillance units watched FLORES DELEON
meet with UM3561 at the front passenger window of the Ram and
retrieve a gray shoebox from UM3561.  At approximately 8:05 p.m.,
surveillance units saw the two vehicles leave the McDonald's
parking lot in tandem.  FLORES DELEON went eastbound on Warner
Avenue and then turned into a shopping center near 204 East
Warner Avenue, Santa Ana, CA.  FLORES DELEON initially pulled to
the rear of the shopping center and was later observed
repositioning his vehicle.

        a.  Based on my training and experience, I know drug
traffickers commonly hide illegal drugs in boxes and other opaque
containers.  I further know drug traffickers commonly reposition
their vehicles multiple times to see if they are being followed
by law enforcement.

        21.  At approximately 8:06 p.m., FLORES DELEON, using TT3,
called CORTEZ-PEREGRINO on 2104.  FLORES DELEON asked if CORTEZ-
PEREGRINO was going to exit the back.  CORTEZ-PEREGRINO replied,
he had seen FLORES DELEON going to the back.  FLORES DELEON asked
if CORTEZ-PEREGRINO was behind him.  CORTEZ-PEREGRINO replied,
no, he was already parked by the bread shop.  FLORES DELEON asked
where to park.  CORTEZ-PEREGRINO asked if FLORES DELEON had "it"
with him.  FLORES DELEON confirmed, yes.  CORTEZ-PEREGRINO told
FLORES DELEON to take it to the door or on the hand.  CORTEZ-
PEREGRINO told FLORES DELEON he could leave after that.  FLORES
DELEON asked for clarification.  CORTEZ-PEREGRINO instructed

FLORES DELEON to park next to him and throw it in the trunk or on
the side where CORTEZ-PEREGRINO was.  FLORES DELEON asked which
car CORTEZ-PEREGRINO was driving.  CORTEZ-PEREGRINO replied, it
was turned on.  FLORES DELEON asked if it was a Toyota.  CORTEZ-
PEREGRINO responded, it was a Lexus.  FLORES DELEON asked if he
should toss it in the trunk.  CORTEZ-PEREGRINO stated it was on
as they were buying bread.  FLORES DELEON again asked if he
should toss it in the trunk.  CORTEZ-PEREGRINO replied, he did
not have the key with him, but it would be fine, at the door,
where CORTEZ-PEREGRINO was.  CORTEZ-PEREGRINO told FLORES DELEON
to let that guy next to him leave.  FLORES DELEON replied, yes.

     a.   Based on my training, experience, and knowledge of
the investigation, I believe CORTEZ-PEREGRINO was referring to
"it" as the gray shoebox containing illegal drugs that FLORES
DELEON received from UM3561 and telling FLORES DELEON where to
put it.

    22.  At approximately 8:09 p.m., investigators saw FLORES
DELEON park next to a black Lexus bearing California license
plate 8MOM699.  Both vehicles parked nose in, facing the bakery.
Investigators saw FLORES DELEON speaking to a male, believed to
be CORTEZ-PEREGRINO, at the driver window of his gray Monte
Carlo.  The front passenger door of the Lexus was open.
Investigators saw an item transfer from FLORES DELEON's car to
the Lexus.  At approximately 8:11 p.m., FLORES DELEON reversed
his Monte Carlo and left.

    23.  At approximately 8:13 p.m., investigators saw an
unknown male, later identified as Edward MURO, wearing a white

long sleeve shirt exit the bakery.  Investigators watched MURO
enter the driver's seat of the Lexus.  Investigators saw the
Lexus reverse from the bakery and proceed eastbound on Warner
Avenue.  Investigators noticed MURO was the sole occupant of the
vehicle.  Investigators were unsure where CORTEZ-PEREGRINO went
after the exchange.  Investigators followed the black Lexus after
the exchange.

> a.   Based on my training, experience, and knowledge of
the investigation, I believe CORTEZ-PEREGRINO brought MURO with
him and left the area once FLORES DELEON gave the gray shoebox
containing the illegal drugs to MURO.  I believe MURO was the
customer for whom CORTEZ-PERIGRINO needed the illegal drugs.
Based on database queries, I discovered that MURO has previous
drug-related charges for possession of methamphetamine for sale
in Santa Ana, CA.

## C.   November 4, 2021 Arrest of MURO for Possession with Intent to Distribute Crystal Methamphetamine

24.   Surveillance units contacted SAPD to assist with a
traffic stop of the black Lexus driven by MURO.  At approximately
8:15 p.m., SAPD Officer Samuel Esparza ("Esparza") conducted a
traffic stop of the Lexus in Santa Ana, CA.  Officer Esparza
asked MURO to step out of the vehicle and placed him in
handcuffs.  Officer Esparza requested a narcotics dog to conduct
a sniff of the Lexus.

25.   At approximately 10:00 p.m., Corporal Gabriel Gutierrez
("Gutierrez") arrived at the scene of the traffic stop.  Corporal
Gutierrez retrieved a narcotics dog from his vehicle and walked

the dog to the front driver's side corner of the black Lexus. Corporal Gutierrez began a search by walking the narcotics dog around the exterior of the Lexus from the front driver's side corner. When Corporal Gutierrez walked along the passenger side of the car, the narcotics dog alerted at the front passenger door/window area.

26. Following the alert from the narcotics dog, Officer Esparza and Corporal Gutierrez conducted a search of the black Lexus. On the floor of the front passenger side was a gray box containing ten clear plastic baggies containing a white crystalline substance resembling crystal methamphetamine. Three cell phones (the **SUBJECT DEVICES**) were also found inside the Lexus and seized from MURO. MURO was arrested on drug possession charges and transported to the Santa Ana Jail.

a. Based on my training and experience, I know that drug traffickers commonly carry multiple cell phones, one of which is usually a "burner phone," to avoid law enforcement detection.

27. The same day, Officer Esparza booked the ten clear plastic baggies containing a white crystalline substance resembling methamphetamine into evidence at the SAPD station per SAPD policies and procedures and Corporal Gabe Gutierrez transferred custody of the **SUBJECT DEVICES** to the DEA.

28. On November 9, 2021, OCDO investigators took custody of the drugs found in MURO's possession. Investigators weighed the drug evidence at the OCDO. The suspected crystal methamphetamine weighed approximately 5358.9 gross grams. TFO Trent Chandler and

I booked the suspected crystal methamphetamine as drug evidence per DEA policies and procedures.

D.   **Training and Experience on Drug-Trafficking Practices**

29.   From my training, experience, and the collective experiences related to me by other law enforcement officers who specialize in drug-trafficking investigations, I know the following:

a.   The distribution of drugs is a continuing criminal activity that occurs over months and often years.  Drug traffickers often maintain books, records, receipts, notes, ledgers, bank records, money orders, and other papers relating to the cultivation/manufacture, transportation, ordering, sale, and distribution of illegal controlled substances.  These individuals commonly "front" (provide illegal controlled substances on consignment) drugs and other controlled substances to their clients and, thus, keep records or communication concerning monies owed.  Such records are often stored on the drug traffickers' cellular phones, smart phones, and other digital devices.

b.   Drug traffickers use telephones, portable cellular and digital telephones, pagers, and other digital devices, sometimes in fictitious and/or other individuals' names, and maintain telephone and address books, telephone bills and other books and papers that reflect names, addresses, and/or telephone numbers of their associates in the narcotic-trafficking organization and customers of narcotics.  Digital devices are often used by drug traffickers to conduct internet searches

regarding information and materials relating to the manufacture and distribution of controlled substances (e.g., searches for addresses and locations where meetings and drug-sale transactions are to occur).

c. Communications between persons buying and selling controlled substances often occur by telephone calls and messages, such as e-mail, text messages, and social media messages, sent to and from phones. This includes sending photos of the controlled substances between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring firearms and other weapons to a deal. Such records are often stored on the drug traffickers' cellular phones, smart phones, and other digital devices.

d. Modern cellular telephones of the type commonly used by drug-traffickers are often set to generate and maintain digital data and records that reflect location information (e.g., Global Positioning System ("GPS") coordinates) that identify travel routes, destinations, origination points, and other locations where the subject telephone has been or traveled. Based on my training and experience, I know that drug-traffickers regularly use vehicles to facilitate their drug-trafficking activities and related money-laundering activities, e.g., to import narcotics, to transport illegal narcotics and drug-sale proceeds from one stash location to another, to deliver narcotics to other co-conspirators, and to travel to and from meeting sites to conduct drug-sale transactions. I further know, based on my training and experience, that drug-traffickers regularly use

cellular telephones while they are engaged in such activities. Thus, I believe that the **SUBJECT DEVICES** contain location information that will constitute evidence of the SUBJECT FEDERAL OFFENSE, including evidence regarding the use of taxi-type services (e.g., Uber and Lyft), the location of hotels used by the Targets of the investigation, the location of co-conspirators, and the location of places used by the Targets and their co-conspirators to stash illegal narcotics and drug-sale proceeds, which money is often used to buy other drugs or laundered.

        e.    Because illegal controlled substances are regularly sold in exchange for cash, drug-traffickers often possess large amounts of U.S. currency that constitutes drug-sale proceeds.  Drug traffickers often use such cash proceeds, or portions thereof, to pay off suppliers of controlled substances or to purchase more controlled substances.  In order to dispose of drug-sale proceeds, drug traffickers also often engage in financial transactions to convert the cash into other forms of assets, including depositing money into bank accounts, converting it to money orders, debit cards, gift cards, or digital currencies, paying various expenses, and purchasing or leasing property.  Drug-traffickers often possess account records, receipts, correspondence, and electronic communications evidencing their receipt, possession, and disposition of drug-sale proceeds.

        f.    Drug-traffickers often possess firearms, as well as related items (e.g., ammunition), to defend themselves and

their supply of controlled substances.  Because firearms are valuable items, drug-traffickers often possess firearms and ammunition that have been obtained as forms of barter in connection with drug-sale transactions.  Drug-traffickers often take photographs of firearms in their possession, and those photographs are often found on digital devices in the traffickers' possession.

E.   **Training and Experience on Digital Devices**

30.   As used herein, the term "digital device" includes the **SUBJECT DEVICES.**

31.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of

evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

   c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

   d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted

   32.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a

digital device for many reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

32.  The search warrant requests authorization to use the biometric unlock features of a device based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user

holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the **SUBJECT DEVICES.**

c.    The person who is in possession of a device or has the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress Edward MURO's thumb- and/or fingers on the device(s); and (2) hold the device in front of Edward MURO's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

33.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### IV.   CONCLUSION

34.  Based on the foregoing, I respectfully submit there is probable cause to believe that (a) MURO used the **SUBJECT DEVICES** to assist in acquiring and possessing controlled substances with intent to distribute, and (b) evidence, fruits, and

instrumentalities of the SUBJECT FEDERAL OFFENSE will be found on

the **SUBJECT DEVICES.**


Attested to by the applicant
in accordance with the
requirements of Fed. R. Crim.
P. 4.1 by telephone on this
___ day of December 2021.


_____
HONORABLE AUTUMN D. SPAETH
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT "A"**

**PROPERTY SUBJECT TO SEARCH**

The following digital devices (collectively, the "**SUBJECT DEVICES**") seized by the Santa Ana Police Department from Edward MURO following a traffic stop on November 4, 2021, and currently in the custody of the Drug Enforcement Administration are subject to search pursuant to this warrant:

      a.    one gray Verizon e Talk flip phone;

      b.    one black Samsung Galaxy S9 in a blue plastic case; and

      c.    one black Samsung Galaxy phone with an eye sticker on the back.

### ATTACHMENT "B"

#### I. ITEMS TO BE SEIZED

1.   The following items are subject to search and seizure pursuant to this warrant as they constitute evidence, fruits, or instrumentalities of violations of the SUBJECT FEDERAL OFFENSE, Possession with Intent to Distribute Controlled Substances in violation of Title 21, United States Code, section 841(a)(1):

a.   Photographs or videos of controlled substances, including, without limitation, cocaine, methamphetamine, heroin, fentanyl, and MDMA tablets;

b.   Photographs or videos of indicia of drug-trafficking, including digital scales, plastic baggies and containers, pay-owe records, lists of drugs and/or quantities of drugs possessed, and U.S. currency;

c.   Photographs or videos of U.S. currency, money-counting machines, and people counting, flashing, or otherwise possessing large amounts of cash;

d.   Photographs or videos of firearms and/or ammunition;

e.   Photographs or videos of any individual possessing, transporting, packaging, or using any controlled substance;

f.   Records, documents, materials, programs, or applications evidencing or relating to the possession, purchase, sale, transportation, or distribution of controlled substances, including ledgers, pay-owe records, distribution or customer lists, internet searches regarding information and materials

relating to the manufacture and distribution of controlled substances, and correspondence and other records referring to the price, quantity/amount, availability, and times of sale or delivery of controlled substances;

g.    Records, documents, materials, programs, or applications referring to or otherwise evidencing the possession, deposit, transfer, or other use or disposition of U.S. currency, including photographs, deposit receipts, money orders, wire transfers, and receipts in an amount over $400 reflecting the purchase or lease of goods or services;

h.    Electronic communications regarding the possession, sale, purchase, transportation, delivery, or distribution of controlled substances or the possession, packaging, transportation, delivery, transfer, or conversion of U.S. currency, including instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, e-mail communications, or other text or written communications sent to or received from any digital device;

i.    Records, documents, materials, programs, or applications reflecting address book information and telephone communications, including contact lists with names and contact information, all stored or saved telephone numbers, and call logs, including logs of received or missed incoming calls, telephone numbers dialed from the **SUBJECT DEVICES**, and all telephone numbers accessed through any push-to-talk functions;

   j. Contents of any calendar or date book stored on any of the digital devices;

   k. Global Positioning System ("GPS") coordinates and other information or records indicating the past location of the **SUBJECT DEVICES**, Edward MURO, or co-conspirators, including travel routes, destinations, origination points, and other locations;

   l. Records, documents, applications, and materials evidencing travel by airplane and car to or from California, including flight schedules; itineraries; telephone numbers, receipts, and other records evidencing use of taxi services and similar internet-based services (e.g., Uber and Lyft); and hotel lodging;

   m. Any **SUBJECT DEVICE** which is itself or which contains evidence, contraband, fruits, or instrumentalities of the SUBJECT FEDERAL OFFENSE and forensic copies thereof; and

   n. With respect to any **SUBJECT DEVICE** containing evidence falling within the scope of the foregoing categories of items to be seized:

    i. evidence of who used, owned, or controlled the **SUBJECT DEVICE** at the time the things described in this warrant were created, edited, or deleted, including logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.  passwords, encryption keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.    records of or information about Internet Protocol addresses used by the device; and

ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.  As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created,

modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

## II.   SEARCH PROCEDURE FOR THE SUBJECT DEVICES

3.   In searching the **SUBJECT DEVICES** (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any **SUBJECT DEVICE** capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.   The search team will, in its discretion, either search the **SUBJECT DEVICES** where they are currently located or transport them to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.   The search team shall complete the search of the **SUBJECT DEVICES** as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.  The government will not search the **SUBJECT DEVICES** beyond this 120-day period without obtaining an extension of time order from the Court.

d.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each **SUBJECT DEVICE** capable of containing any of the items to be seized to the search protocols to determine whether the **SUBJECT DEVICE** and any data thereon falls within the scope of

the items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

e.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

f.   If the search determines that a **SUBJECT DEVICE** does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the **SUBJECT DEVICE** and delete or destroy all forensic copies thereof.

g.   If the search determines that a **SUBJECT DEVICE** does contain data falling within the list of items to be seized, the government may make and retain copies of such data and may access such data at any time.

h.   If the search determines that the **SUBJECT DEVICES** are (1) themselves an item to be seized and/or (2) contain data falling within the list of other items to be seized, the

government may retain the digital devices and any forensic copies of the digital devices, but may not access data falling outside the scope of the other items to be seized (after the time for searching the devices has expired) absent further court order.

i.   The government may also retain a **SUBJECT DEVICE** if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

j.   After the completion of the search of the **SUBJECT DEVICES**, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

4.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5.   During the execution of this search warrant, law enforcement is permitted to (1) depress Edward MURO's thumb- and/or fingers onto the fingerprint sensor of the **SUBJECT DEVICES**

(only if the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the devices in front of Edward MURO's face with his eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement personnel may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

6.   The special procedures relating to the digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.